# IN THE COURT OF APPEALS OF IOWA

---

No. 25-1747
Filed January 28, 2026

---

**In the Interest of E.M., Minor Child,**

**S.A., Mother,**
Appellant.

---

Appeal from the Iowa District Court for Dallas County,
The Honorable Virginia Cobb, Judge.

---

**AFFIRMED**

---

Chira L. Corwin of Corwin Law Firm, Des Moines, attorney for appellant.

Brenna Bird, Attorney General, and Natalie Hedberg, Assistant Attorney General, attorneys for appellee State.

Donna Schauer of Schauer Law Office, Adel, attorney and guardian ad litem for minor child.

---

Considered without oral argument
by Greer, P.J., and Ahlers and Chicchelly, JJ.
Opinion by Greer, P.J.

1

**GREER, Presiding Judge.**

A mother appeals the termination of her parental rights to one child.[1] On our de novo review, we conclude the State established the statutory grounds for termination by clear and convincing evidence and that termination was in the child's best interests. We decline the mother's request for an additional six months to remedy her situation.

## I. Background Facts and Proceedings.

The child was born six weeks premature in May 2024 and tested positive for marijuana at birth. The mother admitted to using marijuana once shortly before she went into labor. On May 17, the State filed a child in need of assistance (CINA) petition.

The child was removed from the mother's care in mid-June, after he was discharged from the hospital. On June 26, the mother had a drug-testing sweat patch applied, after which she tested positive for amphetamine and methamphetamine.

When the child was born, the mother had three older children, all adjudicated as CINA. All three of the children had been removed from the mother's care. In that combined case, the Iowa Department of Health and Human Services (HHS) pursued CINA adjudications due to the mother's substance-use and mental-health issues as well as concerns about her ability to properly supervise the children.

---

[1] The father initially appealed the termination of his parental rights but eventually voluntarily dismissed his appeal.

On August 27, the child was adjudicated in need of assistance. The same day, the mother's parental rights to her three older children were terminated.

During the course of these proceedings, a worker from Families First Counseling Services (FCS) supervised visits between the mother and child. In September, an FCS progress report noted that the mother "loves [the child] very much" but does not "always use the best judgment." For example, the mother gave the child the wrong formula after being told the correct formula to use, which led to the child becoming sick after visits. Despite that, the report noted the mother had "been consistent with her interactions with" the child.

In October, the mother began inpatient substance-use treatment. However, she left after approximately four days. She then completed admission to an outpatient treatment program, attending sporadically and making minimal progress.

In November, the mother started inpatient substance-use treatment at a different treatment program, successfully completing the program in December. She did outpatient aftercare after completing the program but tested positive for THC in December.

Next, the mother began a residential treatment program in January 2025 but left after one day. She originally intended to start there for outpatient treatment, but she and the HHS social worker discussed the possibility of the mother participating in the inpatient program and having the child returned to her care. However, the social worker wanted to see her in the program developing some stability before transitioning the child to her care. The mother chose to exit the inpatient program instead.

HHS requested drug screens in January and February, but the mother did not provide them as requested. However, the mother lived in a county which only provided drug testing for one hour, once per week. Additionally, throughout this case, the mother's driver's license was suspended, so she was unable to transport herself to appointments. For that reason, she was reliant on others to transport her to visits with the child and to meetings with providers. The mother was saving money to be able to take the necessary class to have her license reinstated.

Also in January, the mother completed a substance-use evaluation, which recommended outpatient treatment. On February 20, the mother tested positive for THC.

On March 6, the mother gave birth to another child.[2] This child also tested positive for THC at birth.

In April, the mother began outpatient services at the treatment center that had last evaluated her for substance use. The mother also underwent a mental-health evaluation, which "recommended weekly individual sessions via zoom or in person." There were some difficulties getting the mother to schedule a mental-health therapy admission appointment, but she accomplished this task by May 28. It was recommended the mother attend weekly therapy sessions, and "[d]ue to [her] current obligations, stressors, needs, and barriers she met the criteria to receive mental health services via telehealth."

In April and May, the mother had consistent attendance and excellent participation at the treatment program. She also "participated in random

_____

[2] At the time of this termination hearing, the parties stipulated to the adjudication and disposition of the younger child as a CINA.

drug screening [on April 15 and 29 and May 20] and tested negative for all substances." The progress report for April and May noted the mother "appears forthcoming and motivated in seeking insight into her co-occurring conditions," yet she was not attending weekly therapy sessions as recommended.

An FCS progress report from April noted that the mother's visits with the child had increased to two per week. The report also detailed seven positive visits the mother had with the child from late-March through mid-April.

There was a domestic violence incident between the mother and father at the mother's home on April 30. There is no information in the record regarding what happened. However, an FCS progress report from this same period noted that the mother called and reported the father to the police.

An FCS progress report from May documented that the mother was attending parenting classes two times per week. The mother also reported cleaning out her home to make it more appropriate for the child. She had gotten a new job, seemed "sober and alert," and was "ready to show [the FCS worker] what she ha[d] accomplished from day to day." The mother was hopeful that HHS would "approve her home for interactions." This report also documented eight visits the mother had with the child from April through May.

On May 27, HHS requested the mother participate in a drug screening. The mother did not provide a sample to be tested.

A June progress report from FCS noted that the mother continued to attend substance-use and mental-health counseling, and that she was attending parenting classes once or twice per week. This report also noted

that the mother was preparing her home for the child and was "very pleased" with the work she had put into the home. This report noted eight visits with the child and noted that the mother "continues to attend interactions regularly and confirms her interactions."

The mother participated in the treatment program's drug tests on June 17 and 24, testing negative for all substances. On July 1, HHS again requested the mother provide a drug screen, but she did not comply. On July 8, the mother participated in another treatment center drug test, testing negative for all substances. A July 10 treatment program progress report noted that the mother had consistent attendance and excellent participation and insight.

A July progress report from FCS noted that the mother "continues to engage in services, by meeting with [the Family Support Specialist] each week and attending all her interactions while being prepared with the correct baby formula, snacks and a drink" for the child. The mother was meeting her probation requirements, saving money to take a class to get her driver's license back, working every day, and working on the home to make it appropriate for the child. This report noted that the mother requested visits take place at her home, but that the HHS social worker said the travel would be "too disruptive" for the child to travel that far twice per week for visits. This report noted seven visits with the child from June through July.

Still, a July 16 progress report from the treatment program noted that the mother had attended only three mental-health therapy sessions since her admission on May 28 to the program. This report also noted the mother "actively participates and engages while providing feedback" and that she "appeared forthcoming and appears motivated to seek insight into her mental health." Yet the report confirmed that the recommendation was for

psychotherapy once a week. To that end, the counselor recommended continued telehealth therapy appointments.

On July 22, the father assaulted the mother at the mother's home. The mother reported the assault to the police, and a no-contact order was issued. The mother did not report this incident to HHS or the FCS worker.

The treatment program's August 2 progress report noted that the mother had consistent attendance for the month of July. The report also noted: "The client has demonstrated increased awareness in her co-occurring disorders through recognizing triggers and patterns of behavior. The client continues to work on her treatment plan goals of completing probation and [HHS] requirements."

On August 9, the mother participated in a visit supervised by the child's foster placement. The foster placement observed that the child "was scared and cried the whole time." This weekend visit before the termination trial was the only time the mother took advantage of the extra visitation time that had been offered.

The court held the termination hearing on August 11. At the hearing the court heard testimony from the HHS social worker and the child's father. The mother did not testify. The social worker and GAL recommended termination of the mother's parental rights.

The social worker testified that the mother continued to struggle with the same issues that brought the family to HHS's attention in the first place. One of those concerns involved the mother's living arrangements. The mother was still living with her mother, who had her own mental-health concerns. The social worker noted that one room of their home had been

cleared out to allow for supervised interactions, but the rest of the house was in disrepair. The social worker believed the house would be unsafe for a child.

The mother provided the court with an email from her mental-health therapist, who had taken over after the mother's prior therapist went on parental leave in May 2025. The mother attended her first session with the new therapist on May 28 and had attended six sessions with that therapist.

When asked whether she thought a six-month extension would permit the mother to regain custody of the child, the social worker testified: "I don't believe so." She explained that the mother had yet to provide a drug screen upon request on a random basis and that the mother's "own provider indicat[ed] that her insight level has gone from excellent to moderate." The social worker acknowledged the county's difficult drug-testing schedule and acknowledged there was a process for HHS to go to the mother's home to do the drug screens, but the social worker had not asked for that. In the social worker's view, "it needs to be approved ahead of time through certain protocols, and my understanding is it's very difficult to get that approved." The social worker did not explain why she did not attempt to have it approved, but in any event, the mother had requested that the testing stay local in her home county. Likewise, the mother did not explain why she never submitted to the HHS drug testing requests.

When asked about the mother's mental health, the social worker recalled that, during two of the older children's cases, the mother's "depression had basically paralyzed her to the point where she wouldn't even get out of bed." Thus, the social worker took issue with the mother's decision to participate in telehealth therapy rather than in-person therapy "due to the extensive history of mental health services, not fully complying and—consistently; and to my knowledge, it's not being attended in person

8

yet." This was despite the mental-health provider's recommendation for telehealth visits, although the social worker contended there was transportation available to the sessions if requested.

On October 3, the juvenile court terminated the mother's parental rights. The mother appeals.

## II. Standard of Review.

We review termination-of-parental-rights cases de novo. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014) (citation omitted).

"We will uphold an order terminating parental rights if there is clear and convincing evidence of grounds for termination under Iowa Code section 232.116." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). "Evidence is clear and convincing when there are no serious or substantial doubts as to the correctness or conclusions of law drawn from the evidence." *Id.* (cleaned up).

## III. Analysis.

On appeal, the mother argues the State failed to prove the statutory grounds for termination and that termination was not in the child's best interests. The mother also claims the juvenile court should have granted her a six-month extension of time to have the child returned to her care.

We follow a three-step analysis to determine whether termination of parental rights is appropriate under Iowa Code section 232.116 (2025). *Id.* "First, the court must determine if a ground for termination under section

232.116(1) has been established." *Id*. "If a ground for termination is established, the court must, secondly, apply the best-interest framework set out in section 232.116(2) to decide if the grounds for termination should result in a termination of parental rights." *Id*. at 706–07. "Third, if the statutory best-interest framework supports termination of parental rights, the court must consider if any statutory exceptions set out in section 232.116(3) should serve to preclude termination of parental rights." *Id*. at 707.

Here, the juvenile court terminated the mother's rights under Iowa Code sections 232.116(1)(e) and (g). We conclude the State proved by clear and convincing evidence a ground for termination under section 232.116(1)(g). When the juvenile court orders termination of parental rights on more than one statutory ground, we need only find grounds to terminate on one of the sections to affirm. *See In re J.B.L.*, 844 N.W.2d 703, 704 (Iowa Ct. App. 2014).

**A. Iowa Code section 232.116(1)(g).** To terminate parental rights under section 232.116(1)(g), the State must prove the following:

> (1) The child has been adjudicated a child in need of assistance pursuant to section 232.96.

> (2) The court has terminated parental rights pursuant to section 232.117 with respect to another child who is a member of the same family or a court of competent jurisdiction in another state has entered an order involuntarily terminating parental rights with respect to another child who is a member of the same family.

> (3) There is clear and convincing evidence that the parent continues to lack the ability or willingness to respond to services which would correct the situation.

> (4) There is clear and convincing evidence that an additional period of rehabilitation would not correct the situation.

The mother agrees that the State has proven the first two elements of subsection (g), but she asserts that the State has failed to prove the final two elements. So we address whether the State proved by clear and convincing evidence that the mother lacks the ability or willingness to respond to services and that additional time would not correct the situation.

Unlike other grounds for termination, under this ground, we focus on the parent's behavior in the past termination cases to decide if termination is appropriate given the current parental behavior. *See In re J.H.*, 952 N.W.2d 157, 167 (Iowa 2020). The juvenile court took judicial notice of the August 2024 termination of parental rights order related to the older three children. With respect to those children, who were adjudicated CINA in August 2023, the juvenile court noted:

> To the knowledge of [HHS] there are no records of the mother being involved in mental health therapy. The mother reportedly completed a substance abuse evaluation and had an opportunity to complete inpatient treatment two times and passed on both opportunities. The mother was attending outpatient treatment, but only about half as often as recommended.

Thus, the services needed to correct the long-standing situation focused on substance-use and mental-health treatment. The substance-use treatment component required that the mother submit to HHS-requested drug testing to confirm no use. The mental health consideration required attendance and work at therapy to know what issues to tackle. At the end of the termination trial, the GAL addressed the mother's mental-health treatment concerns, noting:

> this mother became involved with [HHS] back in January 3rd of 2023, with two older daughters, and from that time to now the mother just recently had an intake for mental health treatment in April of 2025. She has not addressed anything with her mental health issues, which are clearly set forth in all of the reports in all of these cases and which were also

highlighted by the State. . . . [S]ince her intake in April of 2025 she's only engaged in approximately six sessions. So it's, again, . . . [an] 11th hour attempt.

Here, the juvenile court confirmed in the earlier termination cases that the mother was "unable to take the basic step of becoming involved in her own therapy, in order to work toward resuming visits." And fast forward to the issues the mother faces in this proceeding, while considering her lack of insight about her mental health in the earlier proceedings, the mother has done too little too late. *See In re C.B.*, 611 N.W.2d 489, 494–95 (Iowa 2000) (concluding a parent's efforts in the last two to three months before the termination hearing were "simply too late" given the parent's lack of progress towards reunification in the eighteen months prior). Even though the mother did attend some sessions after the April evaluation, she did not comply with the recommendations to attend weekly therapy sessions. For example, when the mother did attend inpatient substance-use treatment in November 2024, she chose not to participate in individual therapy, and thus she did not even begin individual therapy until late spring 2025.

The same situation exists as to her substance-use recovery. Although she provided some drug tests to HHS, she failed to test in January, February, May, and July leading up to the termination trial, which, by department policy, resulted in positive findings for each missed test. As for substance-use treatment early in the case, the mother left the recommended inpatient care after four days, tested positive for THC within a month of completing inpatient care elsewhere, and then left another residential treatment program after one day. The most-recent outpatient treatment seemed to be going better since April, but the counselor downgraded the characterization of the mother's insight from "excellent" in early July to "moderate" later that same month.

The HHS social worker involved with the case described the ongoing concerns that had not been remediated during the years of HHS involvement as "concerns for ongoing substance use; meeting her mental health needs; a safe, stable living environment; domestic abuse." And while the mother had submitted to drug screens with her current treatment provider, the social worker noted that the drug screens were "not observed. They are collected when she's planning on attending therapy, so it's a planned appointment. And in the past, . . . according to a criminal report, she had had a vile of urine on her possession, so that brings into question to me future UA drug screens." Even though the termination trial was on the horizon, the mother did not complete the HHS random drug screens requested on May 27 and July 1 or even respond to the social worker.

From April, when the mother underwent a mental health evaluation, until July, the mother only attended three therapy sessions. And while she did attend a few more sessions before the October trial, she was to have attended sessions on a weekly basis over almost six months. In retrospect, the request for mental-health services was made and not followed from the time the mother began interactions with HHS in 2023. And as the social worker opined, "she needs to be able to address her ongoing mental health needs to allow her to progress with her substance abuse treatment to be able to meet all of her needs to keep herself safe and healthy to be able to effectively parent."

The HHS social worker was concerned about the mother's lack of mental health treatment, including her failure to recognize the impact of domestic abuse. Even though there were two incidents of domestic abuse by the father against the mother during these proceedings, a month before the termination trial the mother admitted that she "sees" and "talks" to the

father, even stating that she had withdrawn the no contact order and was hoping he would get involved with visits. Given the fact that the mother did not report the father's domestic abuse to any professional in the case, there were concerns that the mother had not processed the domestic abuse therapeutically.

Based upon this evidence, we find the State showed by clear and convincing evidence that the mother lacks the ability or willingness to respond to services. As discussed above, we commend the mother for her recent participation in mental-health treatment. But, like the State argued, we cannot know if she will have long-term results in avoiding the substance-use pattern that has existed throughout these CINA cases.

As for the fourth element, we further find the State showed by clear and convincing evidence that an additional period of rehabilitation would not correct the situation.[3] After years of services to remedy her issues with substance use and address her mental health, there is still no indication that any period of additional time at this point would correct the situation under Iowa Code section 232.116(1)(g)(4). Accordingly, like the juvenile court, we find clear and convincing evidence to support termination of the mother's parental rights under Iowa Code section 232.116(1)(g). *See J.H.*, 952 N.W.2d at 171. The mother's avoidance of HHS drug testing, the reconnection with the father, and the lack of follow-through on the recommended extensive mental health counseling all support the State's assertions that the mother lacked the willingness or ability to respond to services and that any additional

---

[3] The mother had also requested an additional six months to work towards reunification, but our reasoning here also supports the finding that the situation cannot be corrected in six months. *See In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021) (requiring a showing that the need for removal will no longer exist at the end of the six months).

time would not correct the situation. For those reasons, we conclude the State met its burden to prove grounds for termination under Iowa Code section 232.116(1)(g).

**B. Best Interests.** In the best-interest analysis, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). We look to the parent's past performance as it may indicate the quality of care the parent might provide heading into the future. *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006). As of the termination hearing, the child had been out of the home for sixteen months of his life. The bond between the mother and child was described by the HHS social worker as not significant. As observed, the child only occasionally sought out the mother for care or comfort and most often played independently at visits.

When we focus on the child's immediate and long-term best interests, we find that the child deserves a sober and stable parent who has addressed both the mental-health and substance-use concerns that have impacted the family dynamics. The mother has not shown she is at that point in her recovery. This young child deserves a placement that is stable and safe.

We find the termination of the mother's parental rights is in the best interests of E.M.

**IV. Conclusion.**

Because we find that the State proved the grounds for termination by clear and convincing evidence, and that termination of the mother's parental rights is in the best interests of the child, we affirm the termination of the

mother's parental rights. We decline the request for additional time to correct these long-standing issues.

**AFFIRMED.**